```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF RHODE ISLAND
_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
     v.                             )    Cr. No. 10-169-01 S
                                    )
RUSSELL YATES.                      )
                                    )
_____ )
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Defendant Russell Yates has been indicted for one count of falsely making, forging, and counterfeiting federal reserve notes, in violation of 18 U.S.C. §§ 2 and 471, and three counts of attempting to pass counterfeit United States securities, in violation of 18 U.S.C. §§ 2 and 472. Yates moves to suppress the tangible evidence seized by law enforcement officers and the statements he made after his arrest, on the basis that they are the product of warrantless searches absent consent or any other recognized exception to the warrant requirement. The Court held an evidentiary hearing on the motion on September 28, 2011 and a second hearing on January 23, 2012, and the parties submitted supplemental briefing after each of the hearings. For the reasons set forth herein, the motion is denied.

I.  Background

At the September 28th suppression hearing, the government offered the testimony of Special Agent Brian Deck, who has been an agent with the United States Secret Service for thirteen years. The facts are gleaned from his testimony, which the Court finds credible.

On February 23, 2010, the general manager of the Comfort Inn in Pawtucket, Rhode Island contacted the Providence office of the U.S. Secret Service and reported that a suspected counterfeit bill was passed at its front desk. Agent Deck and Agent Jim Bentz, also of the Secret Service, responded to the hotel and interviewed the manager around midday. The general manager showed Deck the suspected counterfeit bill. The bill, according to Deck, had been "bleached," which means that it was a piece of genuine U.S. five dollar currency paper that had the genuine ink washed off and the image of a hundred-dollar bill printed on it. This process is usually completed using commercially-available degreaser, such as oven cleaner.

The manager told Deck that a guest who was registered for a multi-night stay at the hotel had passed the counterfeit hundred-dollar bill to a front desk clerk as payment for his room. The manager identified the guest as Russell Yates, occupying and registered in Room 128, and he provided Deck with a copy of Yates's temporary Rhode Island driver's license, which

2

had Yates's photograph and name on it. The front desk clerk confirmed that the person in the picture was the person who had passed the counterfeit one-hundred dollar bill.

Deck and Bentz proceeded to Room 128. Deck knocked on the door, and a person who was later identified as Donel Pemberton (Yates's co-defendant in this action) opened the door. Deck knew that Pemberton was not Russell Yates because it was clear that Pemberton was not the person pictured on the driver's license. When Pemberton opened the door, Deck identified himself as an agent with the Secret Service, he showed Pemberton his commission book, and he asked for Russell Yates. Pemberton did not say anything in response, but he took two steps back and opened the door further and "kind of moved out of [the agents'] way and gestured in a manner where his arm was kind of pointing toward the center of the room." (Hr'g Tr. 13:22-25, Sept. 28, 2011, ECF No. 31; see also id. at 52:19-25.) Deck testified that he interpreted this to mean, "[C]ome on in, he's right here," (id. at 14:1-3), and that he felt as though he had been invited in by Pemberton's gesture.[1] (Id. at 53:16-17.) Agents Deck and Bentz entered the hotel room and saw Yates between the two beds.

---

[1] On cross-examination, Deck admitted that, previously, in a report, an affidavit, and his testimony to the grand jury, he had stated that he was invited into the room and he did not mention that Pemberton invited him, in Deck's mind, by way of gesture.

3

Deck testified that, upon entering, he immediately saw an all-in-one printer/scanner on the floor in a box. He also saw two cookie sheets and a blue can of oven cleaner on the shelf in the open closet area, as there was no door on the closet, and plastic bags covering other materials. Deck immediately recognized the oven cleaner as a tool used to produce counterfeit currency.

Deck then proceeded into the room, identified himself to Yates, and informed Yates that he was investigating the passing of a counterfeit note at the front desk. Yates said something to the effect that "girls" he worked with had given him money, which he said was probably the origin of the counterfeit currency. In response to a question, Yates also stated that he had no other counterfeit notes in his possession. Deck asked Yates whether he wanted Deck to examine his currency to see if there were any additional fakes, and Yates responded by pulling out a large roll of currency (about the "size of an apple") and handing it to Deck for review. Deck, in looking through the roll, found five additional counterfeit hundred-dollar bills, with the same serial number as the counterfeit bill passed at the front desk, and three counterfeit fifty-dollar bills. Deck removed these bills from the roll and returned the genuine currency to Yates. Deck characterized Yates as "very cooperative" during his questioning. (Hr'g Tr. 60:4.)

During his conversations with Yates, Deck spotted another printer/scanner sitting on a chair on the far side of the beds. He walked over to that printer/scanner, and behind the machine, between the chair and the machine, there lay a piece of paper with another image of a hundred-dollar bill printed on it. During his testimony, Deck could not recall whether he saw the image before he manipulated the paper. He also saw a laptop computer on the desk.

Pemberton told the agents that the printers, computer, and materials in the closet all belonged to him and that he used the computer to make music and the printers and other materials in the closet for his art class. Deck testified that these items were all in plain view when he walked into the room.

Deck thereafter contacted the Pawtucket Police Department to request that they come and assist with the investigation. Pawtucket police officers arrived and placed Yates and Pemberton under arrest.

After Pemberton and Yates were arrested, Deck looked inside the bag in the closet and found two additional oven cleaning aids, paint brushes, aluminum foil, face masks, and rubber gloves. Deck testified in detail as to how these tools are used to make counterfeit notes.

Deck then followed the Defendants to the Pawtucket Police Department and, along with a Pawtucket detective, read Yates his

5

Miranda rights and asked him questions. Yates refused to answer, but he stated, "I never would have let you search my hotel room if I knew it was going to be all this." (Hr'g Tr. 35:18-20.)

Knowing that Yates would be arraigned in state court the day after his arrest, Deck called the sheriff's department. He asked whether he could look through Yates's personal property, and he was informed that most personal property was left on the defendant, but that Yates would be searched several times in accordance with their protocol.

Deck went to state court to be present when Yates was searched. Yates was brought into a small room, where the sheriffs asked him to take everything out of his pockets. Yates placed the contents of his pockets on a table. Deck looked through the currency and discovered the genuine fifty-dollar bill that served as the pattern note for the counterfeit fifties Yates carried the previous day.[2] Deck testified that if the sheriff's department had told him that it did not have a search protocol, he would have considered obtaining a search warrant.

At the first hearing on this motion, Yates did not put on any witnesses or evidence in support of his motion; however, in

---

[2] Agent Deck testified that this wad of money was smaller than the one Yates had in his pocket right before he was arrested; however, it is not clear on this record whether all of these notes were in the wad of money from the day before.

anticipation of that first hearing, Yates had filed an affidavit reciting his account of the events. After the close of evidence, the government moved to strike Yates's affidavit because Yates had not testified, and therefore, the government did not have the opportunity to cross-examine him. Defense counsel agreed that striking the affidavit would be appropriate because Yates had not testified, and the Court stated that it took defense counsel's statement to be a withdrawal of the affidavit.[3]

After the affidavit was withdrawn and during argument, the Court inquired as to whether Pemberton had the authority to consent to the agents' entrance into the hotel room, and the hearing largely focused on whether Pemberton had actual and/or apparent authority to consent (an issue not briefed in the parties' pre-hearing memoranda).

In its supplemental memorandum, which was filed after the first hearing, the government asked the Court to supplement the record to include admissions found in Yates's affidavit relating to Pemberton's authority to consent. In light of this request and Defendant's objection to it, the Court held a second hearing on the motion to suppress. At the second hearing, the Court

---

[3] In his memorandum filed December 20, 2011, Yates states that the Court granted the government's motion to strike; however, the Court expressly stated that it took Yates's comments to be a withdrawal of the affidavit.

7

granted the government's motion to supplement the record with ¶¶ 6-8 of Defendant's affidavit, reasoning that, in light of the way the hearing had unfolded, the government should be allowed to move part of Yates's affidavit into evidence (namely, those paragraphs containing statements against interest), but that evidence should not be reopened to receive the entire affidavit, because the government did not have a chance to cross-examine Yates. In light of its ruling, the Court also gave Yates the opportunity to present additional evidence if he so wished, but Yates declined the opportunity. Yates did ask the Court to admit ¶ 9, which is not a statement against interest, but which is arguably necessary in the interest of completeness to view ¶¶ 6-8 in their context. Paragraphs 6 through 9 of Yates's affidavit state the following:

> 6. At that time Donel Pemberton was also renting a room at the Comfort Inn in Pawtucket.
> 7. Donel wanted the same lower rate I was getting for the hotel room, but the hotel said it only applied to my room.
> 8. On approximately February 18th I was planning on ending my stay at the hotel, so Donel moved into my room so that he could use the lower rate I was getting.
> 9. On the night of February 22nd I stayed in Room 128 with a friend Melanie. Donel did not stay there that night.

(Def.'s Aff. in Supp. of Mot. to Suppress ("Def.'s Aff.") ¶¶ 6-9, Feb. 15, 2011, ECF No. 16-1.)

II. Analysis

Yates argues that the physical evidence and his post-arrest statements must be suppressed because Pemberton's consent cannot be implied from his gesture; Pemberton did not have actual or apparent authority to consent to entry to or search of the hotel room; and it was unlawful for Agent Deck to look through Yates's money during the inventory search at state court. The government counters that Pemberton's gesture constituted valid consent to enter; Pemberton had both actual and apparent authority to consent; regardless of whether Pemberton validly consented, the doctrine of inevitable discovery applies; and the inventory search was valid.

A. Common Authority

Consent is an exception to the warrant requirement. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Law enforcement agents may obtain consent "from the occupant 'or from a third party who possesses common authority over the premises.'" United States v. Gonzalez, 609 F.3d 13, 18 n.1 (1st Cir. 2010) (quoting Rodriguez, 497 U.S. at 181). Common authority exists where people are mutually using the property and have "joint access or control" over it "for most purposes." Id. "Mutual use means people make such shared use of a residence 'that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection' of the

common residence 'and that the others have assumed the risk that one of their number might permit the common area to be searched.'" Id. (quoting United States v. Matlock, 415 U.S. 164, 171 n.7 (1974)). The consent of an individual with common authority over a residence or hotel room "is valid as against the absent, nonconsenting person with whom that authority is shared." United States v. Meada, 408 F.3d 14, 21 (1st Cir. 2005) (quoting Matlock, 415 U.S. at 170).

In light of the statements in Yates's affidavit and Deck's testimony during the evidentiary hearing, the Court concludes that Pemberton had actual authority over the hotel room. Pemberton had "moved into" Room 128, he had clothing there, and he told law enforcement agents that the purported counterfeiting tools found in the room were his. These facts are sufficient to establish authority to consent. See United States v. Caldwell, 518 F.3d 426, 430 (6th Cir. 2008) (citing United States v. Beasley, 199 Fed. App'x 418, 424 (6th Cir. 2006)) (stating that it is "uncontroversial that a co-occupant could validly consent to a search of the co-occupied hotel room"); see also United States v. Purcell, Criminal Action No. 06-61-DLB, 2007 WL 926972, at *7 (E.D. Ky. Mar. 26, 2007) (stating that co-occupant of a hotel room possesses actual common authority to consent to search of area occupied by herself and the co-occupant). This conclusion is not undermined by ¶ 9 of Yates's affidavit, which

states only that Pemberton had not slept in the hotel room the night before the search. However, Pemberton was clearly back to occupying the hotel room and exercising his authority over the room by the time Deck knocked on the door on February 23, 2010.

    B.    Apparent Authority

Even if Pemberton lacked actual authority when he let the officers enter, "[a] search is valid if, at the time, officers reasonably believe a person who has consented to a search has apparent authority to consent . . . ." United States v. Gonzalez, 609 F.3d 13, 18 (1st Cir. 2010) (citing Rodriguez, 497 U.S. at 185-86, 188-89). The Court must determine whether the facts available to the agents at the time of entry, viewed objectively, would lead a person "of reasonable caution" to believe the consenting party had authority over the premises. Rodriguez, 497 U.S. at 188.

Here, the agents were reasonable in believing that Pemberton had authority to consent. It is true that, according to Agent Deck's testimony, the agents knew the room was registered in Yates's name, believed Yates had passed the counterfeit bill, and knew that the man who opened the door was not Yates. However, the agents were reasonable to presume that, absent circumstances suggesting otherwise, a person who opens the door to a hotel room has authority over the room. See United States v. Rosario, 962 F.2d 733, 737-38 (7th Cir. 1992);

11

cf. United States v. Clark, 96 Fed. App'x 816, 820 (3d Cir. 2004) (holding that a person with a key to the hotel room who seemed to be a "guest in the hotel room" with two others had apparent authority to consent to search of hotel room).

In Rosario, officers investigating a reported marijuana odor knocked on the door of a hotel room, which they knew to be registered to Augusto Estrada, a forty-six year old male. 962 F.2d at 734-35. A man who appeared to be in his mid-twenties to thirty years of age, later identified as Rubin Vilaro, opened the door, and in response to the officers' request to enter, Vilaro welcomed them by gesture. Id. at 735. Holding that Vilaro had apparent authority to allow the officers into the hotel room, the Seventh Circuit noted that the officers had no reason to think the room was occupied by more than one person; Vilaro did not hesitate in gesturing that the officers could enter; nothing in Vilaro's actions or behavior suggested that he needed consent from another person to allow entry; and the other people in the hotel room, including Estrada, did not object to the officers' entrance. Id. at 737. Under these facts, the Seventh Circuit believed that, "by allowing Vilaro unfettered access to the door, the appellants also gave him discretion to decide whom to admit, thereby sacrificing some degree of their privacy." Id.

The instant case is analogous. Pemberton did not act as though he needed to obtain permission to invite in the agents; he showed no hesitation; and Yates did not protest the agents' entry. Indeed, when approaching a hotel room, it is reasonable for officers to believe, absent some signal to the contrary, that the person opening the door has authority to consent to entry or search. By giving a guest unfettered access to the door or the room, the registered occupant has effectively assumed the risk that the guest may freely grant consent. Id.

It is worth noting that, although the Court concludes that this case is on all fours with Rosario, and thus that Yates's argument to suppress is not availing, the Seventh Circuit was careful to note that there may be circumstances in which an officer would not be reasonable in believing that a person who invited the officer into a hotel room (or a home, for that matter) had the authority to do so. See id. at 738 ("That is not to say, of course, that it would be reasonable for law enforcement agents to believe in every instance that someone who invites them into a home or a room is authorized to do so."). But, where (as is the case here) law enforcement agents are invited into a hotel room, and there are no signals undermining a belief that the person has the authority to consent, it is reasonable for the law enforcement agents to believe the person has such authority.

C. Consent

Yates next argues that Pemberton's gesture did not constitute valid consent because the agents never explicitly asked to enter the room and, therefore, Pemberton's gesture could just as well have been interpreted to mean "he's right there," as opposed to "come on in."

It is well established that a person may express his or her consent to a search "in the form of words, gesture, or conduct." United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quoting United States v. Griffin, 530 F.2d 739, 742 (7th Cir. 1976)); see also United States v. Castellanos, 518 F.3d 965, 970 (8th Cir. 2008) ("Consent to search can be inferred from gestures and other conduct."); United States v. Smith, 155 Fed. App'x 747, 750 (5th Cir. 2005) (implying consent where co-occupant opened the door wider and stepped back into the hotel suite); United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (implying consent where occupant stepped aside and motioned for officers to enter); United States v. Turbyfill, 525 F.2d 57, 59 (8th Cir. 1975) (implying consent where resident opened the door and stepped back to let law enforcement officers enter); cf. Lopez-Rodriguez v. Mukasey, 536 F.3d 1012, 1017 (9th Cir. 2008) (stating that an inference of consent to enter may be made where "the officers have verbally requested permission to enter and the occupant's action suggests assent" and that it is

14

not enough for an occupant neither to refuse to speak to law enforcement officers nor order them to leave); Ducey v. Meyers, 144 Fed. App'x 619, 623 (9th Cir. 2005) (noting that consent may be implied from a gesture where it is "unequivocal and specific").

The Court concludes that Pemberton's gesture manifested his consent to the agents' entrance and that the agents were reasonable in believing as much. By stepping back and pointing to Yates in response to the agents' request, Pemberton was signaling to the agents that they were invited to enter and approach Yates. Pemberton's step back can hardly be understood as anything but his making way for the agents to enter, and therefore, it was reasonable for the agents to interpret it as an invitation to enter.

D. Inevitable Discovery of the Piece of Paper

The inevitable discovery doctrine provides that "evidence that 'would inevitably have been discovered without reference to the police error or misconduct' may be admitted at trial." United States v. Crespo-Ríos, 645 F.3d 37, 42 (1st Cir. 2011) (quoting United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011)). "Such evidence is admissible so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is, in fact, inevitable, and (iii) application of the doctrine in a

15

particular case will not sully the prophylaxis of the Fourth Amendment." Id. (internal quotation marks and citation omitted).

In light of the Court's holding regarding Pemberton's authority to consent, it need not reach the government's inevitable discovery argument with respect to consent to entry. However, the Court does conclude that the piece of paper with the counterfeit bill printed on it, that lay between the chair and the printer, was not in plain view, but that it inevitably would have been discovered once Deck secured a warrant to search the room subsequent to Defendants' arrest. Therefore, the Court denies Defendant's motion to suppress with respect to that piece of paper.

E.  Inventory Search

An "inventory search" of a prisoner's personal property at a police station does not violate the Fourth Amendment, United States v. St. Pierre, 488 F.3d 76, 79-80 (1st Cir. 2007) (citing Illinois v. Lafayette, 462 U.S. 640, 648 (1983)), so long as the police "'were following standardized procedures' and were not 'act[ing] in bad faith or for the sole purpose of investigation.'" Id. at 80 (quoting Colorado v. Bertine, 479 U.S. 367, 372 (1987)). The First Circuit has said, however, that while inventory searches have been upheld because the procedures were developed for independent reasons, "[t]hat

reasoning would break down . . . if the procedures were manipulated for investigatory purposes." Id. But, "[t]he presence of an investigative motive does not invalidate an otherwise valid inventory search." United States v. Garner, 181 F.3d 988, 991-92 (8th Cir. 1999) (citing United States v. Lewis, 3 F.3d 252, 254 (8th Cir. 1993), cert. denied, 511 U.S. 1111 (1994); United States v. Marshall, 986 F.2d 1171, 1176 (8th Cir. 1993)).

Deck testified that he was informed that a defendant waiting for arraignment in state district court was allowed to keep his personal property on his person, but that he would be searched several times. Deck made himself present for one of these searches, and this, in and of itself, was not a manipulation of the search protocols. However, to have Deck rifle through the currency looking at each note carefully to determine its unique (or, in this case, not so unique) identifier approaches a manipulation of the protocols. This is not the case where an inventory search reveals a controlled substance or a firearm that is readily identifiable as illicit. That being said, however, the Court does not believe that this is the sort of manipulation that renders an inventory search unconstitutional. The officers did not initiate the search to carry out their investigatory motive, and there is no evidence that they did so in bad faith. Rather, it appears that "the

procedures were developed for independent reasons, such as the safety of the officers or the protection of an owner's property while in the custody of the police." St. Pierre, 488 F.3d at 80. And while the record does not reflect whether an inventory was taken of Yates's personal property or whether the protocol called for a thorough examination of the items, the Supreme Court has said that, "<u>Examining all the items</u> removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure." Lafayette, 462 U.S. at 646 (emphasis added).

Indeed, in St. Pierre, the First Circuit held that marked currency found during a police station inventory search did not offend the defendant's constitutional rights, because the police followed standardized procedures. 488 F.3d at 80. While there is no discussion of the police scrutinizing the currency in St. Pierre, it may be assumed that they must have done as much to determine that they were in fact marked bills. Likewise, Deck was well within the standard protocol in looking through Yates's currency, even if the average officer may not have been as knowledgeable about counterfeit notes as Agent Deck. While he did have an investigatory motive, that does not invalidate this otherwise legal search.[4] Moreover, Deck's testimony that he

---

[4] In light of the Court's holding with respect to the inventory search, it is not necessary for the Court to determine

18

would have obtained a warrant if he thought it was necessary demonstrates that he was not acting in bad faith.

Accordingly, the inventory search did not offend Yates's rights under the Fourth Amendment.

Moreover, even if this inventory search was held to be impermissible as a manipulation of standard protocol, the currency would have been inevitably discovered. Deck could have called the sheriff's department and asked them if Yates had currency on his person. With that information, coupled with the array of counterfeiting tools found the day before at the Comfort Inn that led to Yates's arrest, Deck easily would have had probable cause to obtain a warrant to inspect the currency on Yates's person. This would have constituted independent, lawful means to obtain the notes, and Deck testified that he would have pursued such a course if he had any reason to believe that the sheriff's department did not have a standard protocol for searches prior to arraignment. Accordingly, even if the Court concluded that Deck's examination of the currency violated Yates's Fourth Amendment rights, which it did not, the currency would be admissible under the doctrine of inevitable discovery.

---

whether the notes in Yates's pocket at the police station were identical to those uncovered from his pocket in the hotel room.

III. Conclusion

For the foregoing reasons, Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  March 6, 2012